UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| B. L. H. a minor by her mother RAUNITA N. HOLSEY,<br><br>                Plaintiff,<br><br>      vs.<br><br>CAROLYN W. COLVIN Acting Commissioner of the Social Security Administration.,<br><br>                Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)  No. 1:13-cv-00934-TWP-MJD<br>)<br>)<br>)<br>)<br>)<br>) |

**REPORT AND RECOMMENDATION**

Claimant B.L.H., a minor, by her mother Raunita N. Holsey, requests judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for Supplemental Security Income (SSI) under Title XVI of the Social Security Act ("the Act"). *See* 42 U.S.C. § 1382. For the reasons set forth below, the Magistrate Judge recommends that the decision of the Commissioner be **AFFIRMED**.

**I. Procedural History**

B.L.H. filed an application for SSI on July 23, 2010, alleging onset of disability as of January 1, 1999. B.L.H.'s application was denied initially on November 15, 2010 and denied on reconsideration on February 9, 2011. B.L.H. timely requested a hearing, which was held before Administrative Law Judge Monica LaPolt ("the ALJ") in Indianapolis, Indiana on January 9, 2012. The Appeals Council denied B.L.H.'s request for review on April 8, 2013, making the ALJ's decision the final decision for purposes of judicial review. B.L.H., by and through her mother, filed her Complaint with this Court on June 10, 2013.

1

## II. Factual Background and Medical History

B.L.H., now seventeen years old, was born on December 16, 1996. When B.L.H. was two years old, she was allegedly hospitalized for a period of two weeks due to her asthma,[1] which accounts for the January 1, 1999 alleged onset date. [R. at 299.] In August of 2010, her mother filed for social security income on behalf of B.L.H., who was then thirteen years old, due to the allegedly disabling illnesses and conditions of asthma, bladder control problems, irritable bowel syndrome, sleeping problems, and depression.[2] [R. at 155.] As of February of 2011, B.L.H.'s list of medications included Albuterol and Flovent for her asthma, Lactaid and Milk of Magnesia for her stomach problems, Dicyclomine for her irritable bowel syndrome, Ranitidine for her gastroesophageal reflux disease, Oxybutynin for her overactive bladder, Diphenhydramine for her allergies, and Zoloft for her depression. [R. at 197.]

In 2009, B.L.H.'s treating physician, Dr. Young, referred her to a specialist in pediatric gastroenterology at Riley Hospital for Children because of her recurring abdominal pain. [R. at 269-71.] This pain was initially characterized as a "functional abdominal pain, as [B.L.H.] does not have any other warning signals for any type of inflammatory bowel disease," and her condition "significantly improved" with proper diet and medicine. [R. at 266-68.] On a visit in August of 2010, B.L.H.'s mother informed the nurse practitioner that she was worried that B.L.H. may be depressed, and the Adolescent Clinic at Riley Hospital referred them to Midtown Community Mental Health Center ("Midtown") for this concern. [R. at 262.]

Because B.L.H.'s initial disability report lists "depression" as one of her debilitating illnesses or conditions, the Disability Determination Bureau referred her to a clinical psychologist, Dr. Thomas Smith, for a mental status examination, which was performed on

---

[1] No medical evidence was submitted that supports this assertion.
[2] B.L.H. only challenges the ALJ's decision with respect to her depression [Dkt. 27 at 5.], and the Court will limit the scope of its discussion accordingly.

October 17, 2010.[3] [R. at 322.] B.L.H.'s mother first reported to Dr. Smith that she "filed for SSI due to [B.L.H.]'s asthma, and she has irritable bowel syndrome. [B.L.H.'s mother thinks] she's a bit slow, but she's never been evaluated for [mental status] until today." [*Id.*] When asked about her mood, B.L.H. reported that she is "perky," but her mother said that she is "drained." [R. at 323.] When asked about her daily activities, B.L.H. reported that she enjoys dancing and gets to play basketball, but her mother interjected that B.L.H.'s asthma prevents her from playing basketball. [R. at 327.] At the end of the evaluation, Dr. Smith diagnosed B.L.H. with Post Traumatic Stress Disorder, Depressive Disorder, and suspected Borderline Intellectual Functioning, with a GAF of 50. [*Id.*] Also in October of 2010, B.L.H.'s 7th Grade teacher reported that B.L.H. has no problems acquiring and using information, no problems attending and completing tasks, some problems interacting with others (likely because she once cursed at a classmate), no problems moving about and manipulating objects, no problems caring for herself, and no problems functioning due to her health and physical well-being. [R. at 171-77.]

In February of 2011, Dr. Steven Roush, M.D.; Dr. B. Randal Horton, Psy.D.; and Dr. M. Thomas, CCC-SLP, State Agency consultants, found that B.L.H. has severe impairments, but none that meet, medically equal, or functionally equal a Listing. [R. at 336-37.] Specifically, B.L.H. was found to have less than marked limitation in acquiring and using information because she functions at grade level without the need of special education, no limitation in attending and completing tasks, less than marked limitation in interacting and relating with others because of her teacher's report of "intelligible" speech that was not observed during the examination, no limitation in moving about and manipulating objects, no limitation in caring for herself, and less

---

[3] B.L.H.'s disability report dated August of 2010 lists "depression" as one of B.L.H.'s disabling illnesses even though B.L.H. was not seen by a mental health professional until October of 2010. [R. at 155.] Although history of treatment at Midtown was reported to have existed by October of 2010 [*see* R. at 322], records submitted by Midtown confirm that the date of the "initial intake appointment" was not until February 10, 2011 [R. at 475].

3

than marked limitation in health and physical well-being due to her ability to control her irritable bowel syndrome and asthma symptoms with medication. [R. at 338-39.] In the explanation of findings, the State Agency consultants noted that the allegations were "partially credible" in that the "severity is not supported." [R. at 341.]

On February 10, 2011, B.L.H. and her mother met with a clinician at Midtown for an initial intake appointment, and the clinician noted that B.L.H. "presented with depressed mood and flat effect," was experiencing financial stressors due to limited income, denied having hallucinations but admitted to having visions of the future, and discussed witnessing her cousin's murder seven years prior, at roughly the age of seven. [R. at 475.] B.L.H.'s focus in individual therapy was to help her learn to process her feelings and stand up for herself by expressing those feelings. [R. at 481.] Just over one month after her initial intake, B.L.H.'s mother "reported seeing an improvement in her symptoms since attending therapy," and B.L.H.'s progress report at school reflected all A's and B's. [R. at 484.] By May of 2011, B.L.H. reported positive progress such as decreased depressed moods and increased social activities, and B.L.H.'s mother also reported positive progress such as observations of her daughter's happiness in the home and in the community. [R. at 490.]

In August of 2011, B.L.H. began seeing a new clinician after her previous clinician left Midtown, and B.L.H. reported being happy despite high levels of stress at home regarding their ability to pay the bills. [R. at 504.] In September of 2011, the clinic was informed that B.L.H.'s family needed resources to help overcome their financial barriers because the family relies on one person's disability payments for income and hadn't been able to make "any/all" payments. [R. at 511.] By November of 2011, B.L.H. "presented with bright affect and congruent mood which was much more positive than previous two sessions" because her relationships with her

family members were going well and she had made the honor roll for the previous nine weeks in a row. [R. at 520.] This mood continued to increase when B.L.H. received her court date for her social security appeal because it gave her, and her family, hope that she would be able to help relieve their financial troubles. [R. at 523.] On December 9, 2011, one of the clinicians at Midtown reported that B.L.H. has marked limitation in caring for herself and marked limitation in her health and well-being, but did not explain her responses. [R. at 474.]

At the hearing on this matter, which was held on January 9, 2012, B.L.H., then fifteen years old, and her mother both testified. B.L.H. testified that at school "they're trying to skip [her] up because [she] made honor roll" and that she's a junior counselor with the Big Brother Big Sister program, where she helps third and fourth graders with their homework Monday through Thursday and participates in their social event on Fridays. [R. at 50-52.] B.L.H. did note that she prefers to "stay to [her]self," that when she was younger she sometimes felt like killing herself, and that sometimes she begins to cry not knowing why and has difficulties stopping. [R. at 55, 60.] However, B.L.H. also participates in sports, needing to use her rescue inhaler up to three times per month, and spends time with a few of her friends every other weekend. [R. at 57, 61.] Her mother then testified that B.L.H. often just sits and stares at the wall or at a TV that's not turned on and that she has found her in the bathroom just sitting and crying without knowing why. [R. at 64-66.] B.L.H.'s mother also testified that B.L.H. has to use her rescue inhaler at least four to five times per week but has started to do some walking. [R. at 67-68.] B.L.H.'s mother then told the ALJ that B.L.H. is very busy because of her involvement with the Big Brother Big Sister program, often staying up until nine or ten p.m. to finish her homework and doing homework on the weekends to catch up from missing school for

doctor's appointments because "[s]he wants to be something. She wants to be a lawyer, actually." [R. at 75-76.]

### III. Applicable Standard

For an individual under the age of eighteen to be eligible for SSI, a claimant must have a "disability" as defined by 20 C.F.R. § 416.924. The Act defines disability of a child as a "physical or mental impairment, which results in marked and severe functional limitations, and . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I). In determining whether a minor claimant is disabled, the Commissioner employs a three-step sequential analysis: (1) if the claimant is engaged in work that qualifies as substantial gainful activity, she is not disabled regardless of her medical condition, age, education, or work experience; (2) if the claimant does not have a medically determinable, severe impairment or combination of impairments, she is not disabled; and (3) if the claimant does not have an impairment that meets, medially equals, or functionally equals a Listing or does not meet the twelve-month durational requirement, she is not disabled. 20 C.F.R. § 416.924(a), (b). *See also Murphy v. Astrue*, 496 F.3d 630 (7th Cir.2007); *Giles ex rel. Giles v. Astrue*, 483 F.3d 483 (7th Cir.2007).

In considering whether a child's impairment functionally equals a Listing, the ALJ determines whether the claimant has an extreme limitation in one of the following domains or a marked limitation in two of the following domains: (1) Acquiring and using information, (2) Attending and completing tasks, (3) Interacting and relating with others, (4) Moving about and manipulating objects, (5) Caring for yourself, and (6) Health and physical well-being. 20 C.F.R. 416.926a(b), (d). In determining whether such limitations exist, the ALJ must consider the

functional limitations of all medically determinable impairments, regardless of the severity of the impairment being taken into account. 20 C.F.R. 416.926a(a).

In reviewing the ALJ's decision, the ALJ's findings of fact are conclusive and must be upheld by this Court "so long as substantial evidence supports them and no error of law occurred." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The standard of substantial evidence is measured by whether "a reasonable mind might accept [the evidence] as adequate to support a conclusion." *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000) (quoting *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995)). This court may not reweigh the evidence or substitute its judgment for that of the ALJ, but may only determine whether or not substantial evidence supports the ALJ's conclusion. *Overman v. Astrue*, 546 F.3d 456, 462 (7th Cir. 2008). The ALJ "need not evaluate in writing every piece of testimony and evidence submitted," *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993), but the ALJ must consider "all the relevant evidence," *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). In order to be affirmed, the ALJ must articulate her analysis of the evidence in her decision; she must "build an accurate and logical bridge from the evidence to her conclusion." *Dixon*, 270 F.3d at 1176.

### IV. <u>The ALJ's Decision</u>

The ALJ followed the three-step child disability analysis and initially found that (1) B.L.H. has not engaged in substantial gainful activity and (2) B.L.H.'s "asthma, irritable bowel syndrome, obesity, depression, and post-traumatic stress disorder" are "severe" impairments, as the medical and nonmedical evidence shows that the impairments have more than a minimal effect on the claimant's functioning. [R. at 16.] At Step Three, to determine whether B.L.H.'s impairments meet or medically equal a Listed impairment, the ALJ considered the evidence under Listing 103.03 for Asthma, Listing 105.06 for Inflammatory Bowel Disease, Listing

7

112.04 for Mood Disorders,[4] and Listing 112.06 for Anxiety Disorders. [R. at 16-22.] To meet or medically equal the required level of severity of Listing 112.04, the requirements of both Subparts A and B must be met. The ALJ first found that the requirements of Subpart A were met, as B.L.H. displays more than five of the ten signs or symptoms of major depressive syndrome outlined in Listing 112.04(A)(1): depressed or irritable mood, markedly diminished interest or pleasure in almost all activities, appetite disturbance, sleep disturbance, fatigue or loss of energy, and suicidal thoughts. [R. at 18.]

To satisfy the requirements of Subpart B of Listing 112.04, an adolescent's symptoms must result in marked limitations in at least two of the following four categories: cognitive and communicative functioning; social functioning; personal functioning; and maintaining concentration, persistence, or pace. 20 C.F.R. pt. 404( P), App. 1. The ALJ found that B.L.H. has a mild deficit in cognitive and communicative functioning because, although her fall 2011 grades and school reports were above average, B.L.H. speaks so softly that listeners sometimes have difficulty understanding what she is saying. [R. at 19-20.] Next, the ALJ found that B.L.H. has only a mild limitation in social functioning because, although she reportedly did not get along well with other children and was withdrawn, her counseling seemed to help and she began going for walks with her mother, spending time with friends about every other weekend, and attending the Big Brother Big Sister program on Friday evenings. [R. at 20-21.] The ALJ then found that B.L.H. has no limitations in personal functioning, declaring B.L.H.'s therapist's opinion of a marked limitation as not supported by the evidence, as B.L.H.'s teacher reported no difficulties with self-care and B.L.H. is able to follow medical instructions regarding her diet, exercise, and medications and has age-appropriate recreational interests. [R. at 21.] Finally, the

---

[4] Plaintiff B.L.H.'s arguments in this matter are limited to the ALJ's findings regarding Listing 112.04. [Dkt. 27 at 5, *see* Dkt.19.] Therefore, the Court will limit its discussion of the ALJ's decision to the relevant Listing.

ALJ found that B.L.H. has no limitations in concentration, persistence, or pace because, despite her mother's reports to the contrary, B.L.H.'s teacher and therapist do not report any distractibility or hyperactivity, and B.L.H. was able to complete several age-appropriate calculations and memory tests during a psychological consultative examination. [R. at 21-22.] Having found that B.L.H. did not meet the requirements of Subpart B to Listing 112.04, the ALJ determined that B.L.H.'s impairments do not meet or medically equal Listing 112.04.

The ALJ then considered whether B.L.H.'s impairments functionally equal one of the Listings by addressing each of the six domains used to measure a minor's functionality. First, based on B.L.H.'s above-average grades in school, the ALJ found that B.L.H. has no limitations in acquiring and using information. [R. at 23-24.] The ALJ then, in agreement with the State Agency reviewing Physicians, found that B.L.H. has no limitation in attending and completing tasks. [R. at 24-25.] Because of B.L.H.'s quiet voice and reports of inappropriate language use, coupled with her recent improvement in level of activity, the ALJ found that B.L.H. has only a mild limitation in interacting with and relating to others. [R. at 26-27.] The ALJ likewise found B.L.H. to have a less than marked impairment with moving about and manipulating objects in light of B.L.H.'s asthma, as aggravated by her obesity. [R. at 27-28.] In agreement with the State Agency medical consultants, and contrary to the opinion of a Midtown clinician, the ALJ found that B.L.H. has no limitations in caring for herself because of her ability to properly take her medications and follow her diet and exercise regimen. [R. at 28-30.] Finally, despite B.L.H.'s several severe impairments, the ALJ found that B.L.H. was coping well with her impairments and found that her limitations in health and physical well-being were less than marked. [R. at 30-33.] Without marked limitations in two of the six domains, or extreme

9

limitation in one of the six domains, the ALJ found that B.L.H.'s combined impairments do not functionally equal a Listed impairment.

Thus, although B.L.H.'s medically determinable impairments could reasonably be expected to produce the alleged symptoms, the ALJ concluded that the statements concerning the intensity, persistence, and limiting effects of the symptoms are not credible. Although the ALJ believed B.L.H. and her mother to be "generally credible regarding the claimant's symptoms and functional limitations," the ALJ found that the evidence did not support their allegations of marked functional limitations, as "the record shows improvement in the claimant's physical and mental impairments as she followed treatments, matured, and made friends." The ALJ also acknowledged the October 2010 GAF finding of 50, but found that the non-treating physician relied heavily upon B.L.H.'s mother's reports and gave little weight to the opinion. Further, the ALJ gave no weight to the opinion of B.L.H.'s therapist who found marked limitations in B.L.H.'s ability to care for herself and in her health and well-being, finding that such conclusions were not supported by the evidence. Without at least two marked limitations or one extreme limitation of the six functional domains, B.L.H.'s impairments do not functionally equal a Listed impairment. Accordingly, the ALJ concluded that B.L.H. is not disabled, as defined by the Act.

## V. Discussion

B.L.H. raises three arguments as to why this Court should reverse the decision of the ALJ: (1) the ALJ improperly rejected and ignored evidence that proves disability under Listing 112.04, (2) the ALJ's failure to summon a psychologist to testify at the hearing as to whether B.L.H.'s combined impairments medically equal 112.04 necessitates reversal, and (3) the ALJ's decision to limit the weight given to the testimony of B.L.H. and her mother in determining

functional equivalence contravenes Social Security Ruling 96-7p and is patently erroneous. The Court now examines these issues.

A. The ALJ's Treatment of the Evidence

It is the duty of the ALJ to consider the entirety of the record when making her disability determination; "the ALJ may not simply ignore evidence." *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009). When examining a medical report, the ALJ must examine "the entirety of the mental health assessment" and cannot limit her discussion of a report merely to the portions "that support a finding of non-disability while ignoring other portions that suggest a disability." *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). With regard to GAF scores, however, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) (quoting *Wilkins v. Barnhart*, 69 Fed.Appx. 775, 780 (7th Cir.2003)) (holding that the doctor's narrative, finding no significant medical impairments, substantially supported the ALJ's determination of lack of disability, in spite of the low GAF score given).

B.L.H. argues that the ALJ "arbitrarily rejected the years of psychiatric treatment and examination evidence," including the GAF assessment from October of 2010, the initial intake at Midtown from February of 2011, and the December 2011 functional evaluation by a clinician at Midtown. [Dkt. 19 at 12-16.] B.L.H. asserts that, instead of properly considering the evidence, the ALJ substituted her lay opinion for medical ones, which Seventh Circuit case law does not allow. [*Id.* at 14.] The Court will address each portion of psychological evidence raised by B.L.H. individually.

The first piece of evidence B.L.H. points to is the consultative psychologist's GAF assessment of 50, which B.L.H. argues indicates "total disability." [*Id.* at 13.] When evaluating

whether B.L.H.'s mental impairments meet or medically equal Listing 112.04, the ALJ cited to the consultative psychologist's report extensively—over thirty times within less than five pages. [*See* R. at 18-22.] When the ALJ examined generally whether B.L.H.'s combined impairments functionally equaled a Listed impairment, the ALJ still cited to the consultative psychologist's report several times within each of the six domains except for health and physical well-being. [*See* R. at 24-30.] At the end of the ALJ's decision, the ALJ noted that the GAF rating only "indicates that an individual has serious symptoms of a serious impairment in social, occupational, or school functioning" and that Dr. Smith "saw the claimant on only one occasion and seems to have been unduly impressed with the mother's report of the claimant's symptoms at that point." [R. at 34.] Although B.L.H. claims that a GAF of 50 indicates "total disability," *Denton* and *Wilkins* make it clear that an ALJ is not bound by a GAF score and that no GAF score is a dispositive measure of a claimant's medical or functional state. Instead of relying solely on the GAF score, the ALJ took into account Dr. Smith's written observations and properly weighed them against the other evidence of record, pursuant to *Campbell*'s ruling that the ALJ must take into account the entirety of the medical health assessment.

The remaining evidence regarding B.L.H.'s mental health are her records from Midtown, including her initial intake in February 2011, the functionality report completed by clinician Downey in December of 2011, and notes from dozens of appointments in between. B.L.H. argues that the ALJ "ignored, without explanation, misstated or rejected all of the evidence which proved the claimant's total disability." [Dkt. 18 at 13.] Specifically, B.L.H. points to notes from four of the over thirty appointments that the ALJ allegedly failed to take into account. [*Id.* at 15-16.] While B.L.H.'s brief has highlighted a handful of appointment notes that may support disability, the ALJ discussed twice as many appointment notes, some of which indicated

improvement and some of which indicated difficulty. [*See* R. at 33.] The ALJ is not required to discuss every piece of evidence in detail, however, so the ALJ's failure to discuss every observation made during each of B.L.H.'s appointments does not warrant reversal. *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011) ("A decision denying benefits need not discuss every piece of evidence").

Additionally, B.L.H. argues that the ALJ failed to explain why she did not find B.L.H. to have marked limitations in the domains of Caring for Herself and in Health and Physical Well-being, as indicated by clinician Downey's assessment. [Dkt. 18 at 13.] Explanation is not lacking, however, as the ALJ dedicated several paragraphs to substantiate her conclusion that "neither of [Ms. Downey's] opinions were supported by the evidence." [*See* R. at 21, 29-30, 33-34.] Further, during each of the thirteen times that Ms. Downey herself met with B.L.H., she observed that B.L.H. had a "well-groomed appearance," and she recorded no reports from B.L.H.'s mother that B.L.H. did not groom herself. [R. at 502, 504, 505, 506, 507, 510, 512, 514, 515, 518, 520, 523, 527.]

Instead of finding marked limitations in the domains of caring for herself and for health and physical well-being, as asserted in Ms. Downey's assessment, the ALJ found no limitation in caring for herself, which coincides with the opinions of the State Agency consultants and B.L.H.'s teachers, and less than marked limitation in health and physical well-being, which coincides with the opinion of the State Agency consultant and goes further than her teacher's assessment of no limitation. [*See* R. at 30, 33.] Because "a reasonable mind might accept" the evidence presented as sufficient to sustain the ALJ's finding, *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000), substantial evidence supports the conclusion the B.L.H. does not qualify for SSI disability.

13

### B. Failure to Summon a Medical Expert

In determining whether the claimant's impairments medically equal a Listing, "[a]n ALJ may not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005). Although the ALJ has a duty "to develop the claimant's complete medical history," the ALJ does *not* have a duty "to update objective medical evidence to the time of the hearing." *Luna v. Shalala*, 22 F.3d 687, 693 (7th Cir. 1994) (quotations omitted). Where the medical evidence presented does not indicate the need for an updated medical examination, the ALJ is under no duty to order a consultative examination. *See Howell v. Sullivan*, 950 F.2d 343, 349 (7th Cir. 1991). It is, instead, "the claimant who bears the responsibility of providing medical evidence of an impairment." *Id.* at 348 (citing 20 C.F.R. §§ 404.1504, 404.1508).

B.L.H. claims that the ALJ was duty bound to obtain an updated opinion from a medical advisor, specifically a psychologist, to consider evidence acquired after February of 2011. [Dkt. 19 at 19.] Social Security Ruling 96-6p dictates that an ALJ is only required to obtain an updated medical expert opinion if one of the following two situations occurs: (1) no additional medical evidence is received, but the ALJ's opinion suggests that a judgment of equivalence may be reasonable or (2) additional medical evidence is received that, **in the ALJ's opinion**, may change the medical consultant's original finding that the claimant's impairment does not medically equal a Listing. Because additional medical evidence was received after the State agency consultants submitted their opinions, the latter situation applies.

Here, B.L.H. argues that her impairments medically equal "any Listed impairment such as 112.04" and that the ALJ's failure to summon a medical advisor after new evidence was submitted "requires reversal." [*Id*.] As *Howell* indicates, however, it is B.L.H.'s burden to prove

14

that her symptoms meet or medically equal a Listing. While it is undeniable that new evidence was submitted after the most recent State Agency medical review of the record, the new evidence must, "in the ALJ's opinion," give rise to the possibility that the conclusion(s) of the original agency medical review(s) might change. SSR 96-6p. In an attempt to support her claim, B.L.H., instead of evaluating the new evidence in any detail, merely writes: "Presumably if [the State Agency medical consultants] had reviewed all of the evidence they would have reasonably determined the claimant was totally disabled." [Dkt. 19 at 19.] Without even indicating which Listing is presumably met, not to mention failing to illustrate how the new evidence weighs in favor of a finding of disability, B.L.H. has not met her burden of proof.

Even if B.L.H. had argued the merits of the evidence, however, her argument would fail. B.L.H. specifically notes that the agency medical consultants "did not review the 2-10-11 psychotherapy intake evaluation (R. 475), the 2-11-11 psychotherapy (R. 476), the 3-11-11 psychotherapy (R. 483), the 4-22-11 psychotherapy (R. 487), or the 12-9-11 Midtown mental health clinic functional evaluation (R. 474)." [*Id*.] As previously discussed, these four appointments at Midtown are a select few of dozens of appointments at Midtown that took place throughout the 2011 calendar year. [*See* R. at 473-529.] While B.L.H. did present "with depressed mood and flat affect" and appeared "tearful and sad" during her first two appointments, just over a month later both B.L.H. and her mother reported an improvement since attending therapy. [R. at 475-76, 484.] A lapse in improvement was reported when B.L.H.'s clinician left Midtown and when B.L.H. missed several appointments in a row [R. at 497-502], but the reports indicate improvement again due to better at-home relationships and increased hope regarding the family's financial situation [R. at 520-25]. These records, when taken as a whole, indicate that B.L.H.'s condition continues to improve with consistent treatment.

15

Finally, B.L.H. argues that the functionality report of December 2011, if taken into account by a State Agency consultant, would have changed the consultant's opinion of whether B.L.H.'s impairments "medically equaled any Listed impairment." [Dkt. 19 at 19.] First, the functionality report was just that—a **functionality** report, not a report on medical equivalency—and Social Security Ruling 96-6p only requires an ALJ to acquire and "updated medical expert opinion . . . before a decision of disability based on **medical** equivalence can be made." The question of medical equivalence is wholly distinct from functional equivalence. To medically equal Listing 112.04, for example, a child must have marked limitations in two of the following four categories: cognitive and communicative functioning; social functioning; personal functioning; and concentration, persistence, or pace. 20 C.F.R. pt. 404( P), App. 1. The functionality report is based on the following six domains: acquiring and using information; attending and completing tasks; interacting and relating to others; moving about and manipulating objects; caring for yourself; and health and well-being. [R. at 474.] While the clinician at Midtown reported two functional domains of "marked" impairment (caring for yourself and health and well-being), these two domains are seemingly subsumed by one category of medical equivalence: personal functioning. Thus, even if a medical expert took Ms. Downey's report as conclusive evidence of B.L.H.'s condition, he could not have concluded that B.L.H.'s impairments **medically** equal a Listing 112.04, as only one, and not two, categories would reflect "marked" impairment. Accordingly, the ALJ did not err in failing to seek an updated medical opinion after the new evidence was submitted.

B.L.H. also argues that the ALJ "cited no evidence regarding medical equivalence to a Listing," asserting that the ALJ thereby wrongfully relied upon her own lay opinion in reaching her conclusion. [Dkt. 19 at 20.] This is a complete mischaracterization of the ALJ's decision.

In fact, the ALJ spent over four pages of her single-spaced decision citing to evidence regarding medical equivalence to an affective or anxiety disorder, which is the only issue on appeal. [*See* R. at 18-22.] During this discussion, the ALJ cited heavily, dozens of times, to the report conmpleted by the State Agency medical consultants, which concluded that B.L.H.'s impairments do not meet or medically equal a Listed impairment. [R. at 336-41.] Thus, B.L.H's assertion that the ALJ relied on her own lay opinion is unfounded, and reversal for failure to defer to the medical evidence of record to determine medical equivalency is not appropriate.

### C. Credibility Determination

After an ALJ determines that a minor claimant's combined impairments neither meet nor medically equal a Listing, the ALJ must determine whether the claimant's impairments *functionally* equal a Listing by evaluating the claimant'developmental domains: (1) Acquiring and using information, (2) Attending and completing tasks, (3) Interacting and relating with others, (4) Moving about and manipulating objects, (5) Caring for yourself, and (6) Health and physical well-being. 20 C.F.R. 416.926a(b), (d). In evaluating a child's functioning, the ALJ takes into account the "whole child," measured by the child's activities as performed "at home, at school, and in the community." S.S.R. 09-1p. With no requirement to consult with medical experts at this stage, it is the ALJ who determines functional equivalence, based on the evidence presented. *Id.* Additionally, so long as the ALJ gives "specific reasons" for her credibility findings, the ALJ's measure of the credibility of the witnesses is given great deference; only a "patently wrong" determination will be overturned *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

B.L.H. argues that the ALJ's credibility determination contravenes Social Security Ruling 96-7p and that it was improper for the ALJ to first determine B.L.H.'s functional capacity

before addressing her credibility. [Dkt. 19 at 21-22.] First, the SSR 96-7p discusses an individual's credibility with regard to "the evaluation of symptoms" and defines symptoms as "an individual's **own description of his or her** physical or mental impairment(s)." S.S.R. 96-7p (emphasis added). In other words, the plain language of the ruling applies only to the relative credibility of the claimant herself, not of her mother—especially since she was fifteen years old at the time of her hearing and able to testify on her own behalf. At the hearing, B.L.H. testified that she is actually doing rather well; she had made honor roll and worked to tutor and mentor younger children with the Big Brother Big Sister program, she has friends she socializes with at the program and every other weekend at home, she takes her medications as prescribed, and she participates in sports. [R. at 50-61.] While B.L.H. did testify that she goes to therapy, is on several medications, and has occasional symptoms such as difficulty sleeping and difficulty controlling her emotions, the ALJ took this testimony into account during her analysis. [*See* R. at 18 ("[B.L.H.] testified that she was depressed because her relative had been killed and her grandfather had died recently. She stated that she cried for unexplained reasons at times, felt bad about herself, and wanted to kill herself when she was younger").]

In evaluating B.L.H.'s functioning, the ALJ received evidence and testimony regarding B.L.H.'s activity both at home and at school, pursuant to Social Security Ruling 09-1p. For such testimony, the ALJ relied on reports from B.L.H. herself, her mother, her teachers, and other school reports. [*See* R. at 23-34.] Based on B.L.H.'s above average grades and school reports, the ALJ found that she had no limitation in acquiring and using information. [R. at 24.] The ALJ did note that B.L.H.'s mother "paints quite a different picture of the claimant's behavior than the remainder of the evidence demonstrates" with regard to B.L.H.'s ability in attending and completing tasks, the ALJ deferred to B.L.H.'s teachers' reports in finding no limitation. [R. at

25.] Based on reports from B.L.H., her mother, and her teachers that B.L.H. is soft spoken and prefers to keep to herself, the ALJ found a mild limitation in interacting and relating with others. [R. at 26-27.] Regarding B.L.H.'s ability to move about and manipulate objects, the ALJ relied on B.L.H.'s testimony and her mother's testimony of increased physical activity in 2011, in conjunction with B.L.H.'s teacher's report of no observed difficulties, to find that B.L.H. has a mild limitation, due to her asthma and obesity. [R. at 28.] Although B.L.H.'s mother claimed to help B.L.H. get dressed and put her hair in a ponytail, B.L.H. reported that she picks up after herself and follows her medical advice, such as a daily medication routine and improved diet and exercise, so the ALJ found no limitations in caring for herself. [R. at 29-30.] Finally, relying heavily on the evidence of B.L.H.'s improvement as provided to Midtown by B.L.H. and her mother in 2011, the ALJ found that B.L.H. had a less than marked limitation in her health and physical well-being. [R. at 31-33.] Thus, the ALJ did, indeed, rely on the proper kind of testimony as required by Ruling 09-1p in making her functionality determination.

B.L.H.'s second argument regarding the ALJ's functionality finding is that it was improper for the ALJ to make the functionality finding before making a credibility determination. [Dkt. 19 at 22.] This argument gives import to the location of the credibility analysis within the ALJ's decision, which promotes form over substance in a manner that the Court will not condone. B.L.H. further argues that the credibility determination was "irrational" and "erroneous" because the determination was allegedly "boilerplate." [*See id*. at 21-23.] In her credibility determination itself, the ALJ reasoned that:

> The claimant and her mother were generally credible regarding the claimant's symptoms and functional limitations. Treatment records were consistent with their reports of impairments and show that the claimant was compliant with recommended treatments. To the extent that the claimant and her mother alleged that the claimant had a marked functional limitation, the evidence does not support their allegations. Instead, the record shows improvement in the

claimant's physical and mental impairments as she followed treatments, matured, and made friends.

[R. at 34.] This analysis goes beyond boilerplate language and addresses B.L.H.'s case specifically, which explanation is precisely the manner of reasoning required by S.S.R. 96-7p. Further, this reasoning is supported by the State Agency consultants' conclusion that the allegations were "partially credible" and that the "severity is not supported" by the record. [R. at 341.] Because only a "patently wrong" credibility determination will be overturned, the Court defers to the ALJ's finding, and substantial evidence supports the ALJ's determination that B.L.H.'s impairments do not functionally equal a Listed impairment.

## VI. Conclusion

For the aforementioned reasons, the Court should find that substantial evidence supports the ALJ's determination that B.L.H. is not disabled. The Commissioner's decision should therefore be **AFFIRMED**. Any objections to the Magistrate Judge's Report and Recommendation shall be filed with the Clerk in accordance with 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), and failure to timely file objections within fourteen days after service shall constitute a waiver of subsequent review absent a showing of good cause for such failure.

Date: 05/27/2014

Mark J. Dinsmore
United States Magistrate Judge
Southern District of Indiana

Distribution:

Patrick Harold Mulvany
patrick@mulvanylaw.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov

20